# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

Joseph Wilborn, (R17937),     )
                                     )
               Petitioner,     )
                                     )      Case No. 14 C 5469
           v.            )
                                     )      Judge John Robert Blakey
Randy Pfister, Warden,     )
                                     )
              Respondent.    )

## MEMORANDUM OPINION AND ORDER

Petitioner Joseph Wilborn,[1] a prisoner at the Pontiac Correctional Center, brings this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his 2006 first-degree murder conviction in the Circuit Court of Cook County. Petitioner was convicted of first-degree murder for the shooting death of Emmit Hill. He was sentenced to 55 years of imprisonment. For the following reasons, the Court denies the petition and declines to issue a certificate of appealability.

## I. Legal Standard

Federal review of state court decisions under § 2254 is limited. With respect to a state court's determination of an issue on the merits, habeas relief can be granted only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). This Court

---

[1] The state court record contains spellings of Petitioner's last name as both Wilborn and Wilbourn. Petitioner spells his name as Wilborn in his habeas corpus petition, so the Court adopts that spelling throughout this opinion.

presumes that the state court's account of the facts is correct, and Petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012).

State prisoners must give the state courts "one full opportunity" to resolve any constitutional issues by "invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If a petitioner asserts a claim for relief that he did not present in the first instance to the state courts, the claim is procedurally defaulted and "federal courts may not address those claims unless the petitioner demonstrates cause and prejudice or a fundamental miscarriage of justice if the claims are ignored." *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010).

## II. Background and Procedural History

This Court begins by summarizing the facts and procedural posture from the state court record [22] (attaching Exhibits A to O), including the Illinois Appellate Court's opinions on direct appeal, *Illinois v. Wilborn*, No. 1-06-2088 (Ill. App. Ct. May 22, 2008) (Exhibit D [22-4]), and post-conviction review, *Illinois v. Wilborn*, 962 N.E.2d 528 (Ill. App. Ct. 2012) (Exhibit L [22-12]). This Court presumes that the state court's factual determinations are correct for the purposes of habeas review, as Petitioner does not point to any clear and convincing contrary evidence. 28 U.S.C. § 2254(e)(1); *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C.

2254(e)(1)).

The case arises out of the July 28, 2004 shooting death of Emmit Hill near East 63rd Street and South Michigan Avenue on Chicago's Southside. [22-4], pp. 1-2. The evening's events began in front of an apartment building at 6253 South Michigan, which is located at the intersection of 63rd and Michigan. *Id*. at 2. At least nine men were present in the area that evening: Petitioner, the victim (Emmit Hill), Cedrick Jenkins (who would later be tried as Petitioner's co-defendant), an individual known as "Chub," and Clarence Morgan, David Parker, Keith Wright, Samuel ("Moochie") Richards, and Frederick Sanders. *Id*. at 2-3; *Wilborn*, 962 N.E.2d at 532.

The victim and David Parker were associated with the Black Gangster Disciples. [22-4], p. 3. Petitioner, Cedrick Jenkins, and Chub were members of a rival gang, the Insane Gangster Disciples. *Id*. By way of background, the Black Gangster Disciples initially claimed the apartment building at 6253 South Michigan as drug territory, and prevented the Insane Gangster Disciples from selling drugs at that location. *Id*. The Black Gangster Disciples later lost control of the building when federal authorities arrested several of that gang's members. Following the arrests, the Insane Gangster Disciples attempted to take over the drug business in the building. *Id*. Two weeks before his murder, the victim confronted Petitioner, Jenkins, and Chub regarding drugs sales at the building. *Id*.

Sometime between 11:00 and 11:30 p.m. on July 28, 2004, Petitioner, Jenkins, Chub, Clarence Morgan, David Parker, and the victim were present outside the building. *Id.* Morgan and Parker both testified at trial that neither saw the victim with a gun. [22-4], pp. 2, 3. Morgan and Parker saw Chub hand Jenkins a sweatshirt, which seemed strange to them, given the hot late July weather. *Id.* In response, the victim told Chub that he "'was [] bullshit.'" *Wilborn*, 962 N.E.2d at 532. Morgan took this to mean that the victim was telling Chub that he was "'up to no good . . . .'" *Id.*

Following the exchange, Petitioner and Jenkins walked away from the building into a gangway. [22-4], p. 2. The gangway, which is a small area between two buildings, ran east/west connecting Michigan and Wabash Avenues just north of 63rd Street. *Wilborn*, 962 N.E.2d at 532-33. 63rd Street runs east/west, and Wabash and Michigan Avenues run north/south. Wabash is a one street west of Michigan.

Morgan testified that he saw the victim follow Petitioner and Jenkins into the gangway. [22-4], p. 2. Morgan lost sight of the group, and about a minute later, he heard five gunshots coming from the gangway. *Id.* Parker testified that he also heard seven gunshots and saw the gangway "'lighting up with sparks.'" *Id.* at 4.

Morgan, Parker, Keith Wright, and Moochie Richards investigated the shooting, walking south on Michigan to 63rd Street, west on 63rd to Wabash, and then north to the gangway. *Id.* at 3-4. There, they found the victim shot dead in

the gangway by Wabash. *Id.* The group did not see Petitioner, Jenkins, or anyone else on the scene. *Id.* They did not find a gun at the scene or on the victim's body. *Id.* Richards searched the victim's pockets for drugs. *Id.* at 4.

Sanders, who lived in the area, heard the gun shots while driving in his car. *Id.* at 2. He testified that he drove over to Wabash and saw Richards standing over the victim's body. *Id.* Sanders called the police. *Id.* He did not see anyone in the area with a gun and did not see Richards take a gun from the victim's body. *Id.* Sanders testified that he did not see Petitioner or Jenkins in the area. *Id.*

Chicago Police Department Forensic Investigator John Kaput testified that he walked the crime scene the night of the murder and recovered five fired Wolf brand 9-millimeter Luger cartridge casings and a 9-millimeter fired bullet. *Wilborn*, 962 N.E.2d at 535. No gun was found at the crime scene. *Id.* at 543. An Assistant Cook County Medical Examiner testified that she performed an autopsy on Hill's body and determined that he had seven bullet entrance wounds, and five exit wounds; she recovered two bullets from the body and found a third bullet in the victim's clothing. *Id.* at 535.

A responding Chicago Police Department detective testified that he interviewed witnesses at the scene, and, as a result of the on-scene investigation, police began a search for Petitioner, Jenkins, and Chub. *Id.* at 534. The police were unable to locate the three men that night. *Id.*

Stacy Daniels, a friend of Petitioner's for more than four years, testified that two weeks after the shooting, on August 12, 2014, Petitioner told Daniels that, "he 'got into some problems,' and that he was in 'some serious shit.'" *Id*. Daniels testified that Daniels and Petitioner then went to Daniels' apartment, which Daniels shared with Xavier Woolard. *Id*. Woolard and his girlfriend, LaKeisha,[2] were at the apartment when Daniels and Petitioner arrived, and Jenkins was also there. *Id*.

Once at the apartment, Petitioner told Daniels about the shooting. Daniels testified that Petitioner explained that the victim had followed him into the gangway, and was "'fittin' to do something to him.'" *Id*. Petitioner "'turned around busting,'" which Daniels understood to mean shooting. *Id*. Petitioner then told Daniels that he needed money to leave town. *Id*. He said he might "'hit a lick or something like that,'" which Daniels understood to mean that he might commit a robbery. *Id*.

Daniels and Woolard left the apartment to go to a party, while Petitioner, Jenkins, and LaKeisha stayed behind at the apartment. *Id*. Chicago police officers arrested Woolard at the party for an unrelated battery offense, and, following his arrest, Woolard told the police that there were two men in his apartment wanted on murder charges. *Id*. He gave consent for the police to search the apartment. *Id*.

The police then conducted the search of Daniels and Woolard's apartment. *Id*. The search revealed firearms and ammunition. *Id*. Petitioner, Jenkins, and

[2] The state appellate court opinion refers to the girlfriend by her first name only. Petitioner identifies her as "Laquisha Bondsby" in his habeas corpus petition. [1], p. 31.

LaKeisha were present in the apartment during the police search, as was Daniels, who had returned there after Woolard was arrested at the party. *Id*. During their search, the police found in Woolard's bedroom a 9-millimeter Glock brand handgun loaded with two bullets, as well as an additional 28 rounds. *Id*. The police also searched Petitioner, who had one Wolf brand Luger bullet and four "hollow point" Luger bullets in his pocket, and Jenkins, who had a 9-millimeter High Point handgun loaded with seven bullets. *Id*.

The Illinois State Police Crime Lab performed forensic testing on the weapons and ammunition seized during the police search, to compare them to the cartridges and bullets recovered from the crime scene and from the victim's body. Consistent with that testing, the parties stipulated that one of the five cartridge casings recovered at the crime scene was fired from the Glock handgun found in Woolard's bedroom. *Id*. at 535. They further stipulated that the other four cartridge casings were all fired from the same gun, but that neither the Glock nor the High Point handgun recovered during the search had fired those four cartridges. *Id*. The fired bullet recovered at the scene was not fired from the High Point handgun, but the forensic testing was inconclusive as to whether the bullet was fired from the Glock handgun found in Woolard's bedroom. *Id*. The parties further stipulated that forensic testing showed that the three bullets recovered from the victim's body via the autopsy were fired from the same gun, but not from the Glock or High Point handguns. *Id*. Additionally, testing determined that the one fired bullet recovered

by the police at the crime scene and the three bullets recovered during the autopsy were not fired from the same gun. *Id.*

Although counsel suggested in his opening statement that Cedrick Jenkins would testify for the defense, counsel ultimately elected not to present Jenkins as a witness. *Id.*

The jury found Petitioner guilty of first-degree murder, and the trial court sentenced him to 30 years, plus 25 years for personally discharging a firearm.

Petitioner appealed, raising three claims. *See* Exhibits A [22-1], C [22-3]. First, he argued that the state committed prejudicial error in interpreting the phrase "hit a lick" to mean that Petitioner intended to commit a future robbery. Next, Petitioner claimed that the state's closing argument denied him a fair trial, because the prosecutor told the jury that if he had acted in self-defense he would have turned himself in to the police. Finally, Petitioner argued that the trial court erred in imposing a 25-year firearm enhancement when the jury never actually determined that he had personally discharged a firearm.

The Appellate Court affirmed Petitioner's conviction and sentence. *See* Exhibit D [22-4]. Counsel then filed a petition for leave to appeal ("PLA"), raising just this last issue regarding the applicability of the firearm enhancement, *see* Exhibit E [22-5]. Petitioner then sought leave to file a pro se PLA raising the "hit a lick" argument as well. *See* [22-7]. The Illinois Supreme Court granted Petitioner

the opportunity to file his *pro se* PLA, *see* Exhibit F [22-6], but ultimately denied the PLA, *see* Exhibit H [22-8].

Petitioner also filed a pro se post-conviction petition claiming ineffective assistance of trial and appellate counsel; his petition was rejected both initially and on appeal, *see* Exhibits I [22-9], L [22-12]. Petitioner then filed a PLA with the Illinois Supreme Court, and the Supreme Court denied the PLA on March 26, 2014. Exhibit M [22-13].

Petitioner then filed the instant habeas corpus petition [1] on July 16, 2014.

## III. Petitioner's Claims

In his habeas petition, Petitioner asserts seven claims. In claim one, he alleges ineffective assistance of trial counsel for: (a) presenting a self-defense theory that was unsupported by the evidence; (b) promising the jury eyewitness testimony, then changing his mind mid-trial; (c) failing to call co-defendant Cedrick Jenkins at trial; and (d) failing to call exonerating witness Randell Walton. In claim two, he alleges that the jury received conflicting instructions concerning accountability. In claim three, he alleges that: (a) the trial court erred in failing to strike biased jurors; and (b) his appellate counsel was ineffective for failing to raise the biased juror issue on appeal. In claim four, he alleges that the prosecution made improper arguments before the jury by suggesting Petitioner was planning a robbery. In claim five, he alleges that the prosecution improperly commented on Petitioner's pre- and post-arrest silence. In claim six, he alleges that the trial court erred in imposing a

25-year sentencing enhancement. And, in claim seven, he alleges that the trial court erred in allowing the introduction of hearsay. *See* [1], p. 9.

### A. Procedural Default - Claims 1(a), 1(d), 2, 3(a), 3(b), and 5

Respondent argues that claims 1(a), 1(d), 2, 3(a), 3(b) and 5 are procedurally defaulted. Claim 1(a) alleges ineffective assistance of trial counsel for raising an unsupported self-defense theory to the jury. Petitioner argues that a self-defense theory was contradicted by the victim's gunshot wounds identified by the autopsy. [1], p. 10. The autopsy showed that the victim had seven entrance and five exit gunshot wounds. *Id*. The doctor who performed the autopsy testified that four of entrance wounds were on the victim's back, which led her to conclude that the victim was shot while lying down or bent over, or that he was shot from behind. *Id*. Given this evidence, Petitioner argues, his lawyer was ineffective for presenting a flawed self-defense argument that the jury rejected when finding him guilty. Claim 1(d) alleges ineffective assistance of trial counsel for failing to call Randall Walton as a witness at trial. *Id*. at 31. Petitioner claims that he never confessed to Stacy Daniels, and that Daniels' testimony to the contrary was a lie. Petitioner argues that Walton, who was present in the apartment, could have rebutted Daniels' testimony. In claim 2, Petitioner alleges that the jury received conflicting instructions regarding accountability liability. *Id*. at 34. Although Petitioner's trial was severed from Jenkins' trial, the jury was instructed that it could hold Petitioner liable for Jenkins' conduct. In claim 3(a), Petitioner alleges that his trial

attorney was ineffective for failing to strike biased jurors, *id*. at 40.  Relatedly, in claim 3(b), he argues that his appellate counsel was ineffective for failing to raise this biased juror issue on appeal.  *Id*. at 42.  Lastly, in claim 5, Petitioner alleges that the prosecutor improperly commented on Petitioner's pre- and post-trial silence.  *Id*. at 48.

Respondent is correct that claims 1(a), 1(d), 2, 3(a), and 3(b) are procedurally defaulted because Petitioner failed to present these claims in the state court proceedings.  In order to obtain federal habeas review, a state prisoner must first submit his claim "through one full round of state-court review."  *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)); *see also* 28 U.S.C. § 2254(b)(1).  Petitioner must present the operative facts and controlling law of the claim before the state courts so that they have a meaningful opportunity to consider the claim before it is raised in federal court. *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) (citations omitted).  Petitioner must also raise the claim through all levels of the Illinois courts, including in a petition for leave to appeal (PLA) before the Supreme Court of Illinois.  *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-46 (1999)).  As explained above, these claims were not raised to the state courts in the first instance, and the time for raising them in the state courts has expired.  As a result, claims 1(a), 1(d), 2, 3(a) and 3(b) are procedurally defaulted.

Furthermore, even though Petitioner did raise an ineffective assistance claim in his state court appeal, he failed to raise the underlying factual theories for the claim that he asserts here. Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel to preserve the respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [Petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "Petitioner cannot argue one theory [of ineffective assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)). Petitioner did not present the factual basis for claims 1(a) or 1(d) to the Illinois courts, and those claims are therefore defaulted.

Respondent is also correct that claim 5 is procedurally defaulted because it was dismissed on an adequate and independent state law ground. The Illinois appellate court held that Petitioner waived this issue on appeal because he failed to raise a proper objection at trial, and failed to renew the issue in a post-trial motion,

as required by Illinois law. [22-4], p. 11. As a result, this claim is also procedurally defaulted here, even though the appellate court considered the merits in the alternative under a plain error review. *See Kaczmarek v. Rednour*, 627 F.3d 586, 592-93 (7th Cir. 2010) ("when a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules (i.e., because the petitioner failed to contemporaneously object), that decision rests on independent and adequate state procedural grounds"; where the state court "reviews a federal constitutional claim for plain error because of a state procedural bar (here, the doctrine of waiver), that limited review does not constitute a decision on the merits.").

Certainly, a federal court in a § 2254 case can review a procedurally defaulted claim upon showing: (1) that there was cause for the default and prejudice; or (2) that a fundamental miscarriage of justice would result if the claim is not reviewed. Petitioner here, however, demonstrates neither. Cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). Only the third example is relevant here: Petitioner faults his

counsel at trial, on direct appeal, and in his post-conviction proceedings for failing to properly preserve his defaulted claims. For counsel's ineffective assistance to amount to "cause" excusing the default of an underlying issue, however, the ineffective assistance of counsel that resulted in the failure to preserve the claim must itself be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner failed to preserve such ineffective assistance of counsel arguments in state court as well; and therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural defaults.

This leaves Petitioner with only the fundamental miscarriage of justice (actual innocence) gateway to excuse his default. Proving actual innocence in this context requires Petitioner to demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 133 S. Ct. at 1928 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). To make a credible claim of actual innocence, Petitioner must present new, reliable evidence that was not presented at trial – such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful

evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.") (internal quotation omitted). Petitioner has no such evidence. Instead, he argues that the state's witnesses lied, and he ignores the fact that several eyewitnesses placed him in the gangway immediately before the shooting. Such evidence does not demonstrate actual innocence. *McQuiggins*, 133 S. Ct. 1928.

For all of these reasons, claims 1(a), 1(d), 2, 3(a), 3(b), and 5 are denied because they are procedurally defaulted.

### B. Merits Review – Claims 1(b), 1(c), 4, 6, and 7

Petitioner's remaining claims – claims 1(b), 1(c), 4, 6, and 7 – are denied on the merits. A writ of habeas corpus cannot issue unless Petitioner demonstrates that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Because the state courts adjudicated Petitioner's claims on the merits, the Court's review of the present habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or unless the state court decision was based upon an unreasonable determination of facts. 28 U.S.C. § 2254(d).

A federal habeas court "may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "An 'unreasonable application' occurs when a state court 'identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of Petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

Clearly established federal law refers to the "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). The state court is not required to cite to, or even be aware of, the controlling Supreme Court standard, as long as the state court does not contradict that standard. *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court begins with a presumption that state courts both know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). This presumption is especially strong when the state court is considering well established legal principles that have been routinely applied in criminal cases for many years. *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

Finally, the Court's analysis is "backward looking." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). The Court is limited to reviewing the record before the state

court at the time that court made its decision.  *Id.*  Thus, the Court is limited in considering the Supreme Court's "precedents as of 'the time the state court renders its decision.'"  *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Cullen*, 562 U.S. at 182; *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).

The AEDPA's standard is "intentionally 'difficult for Petitioner to meet.'"  *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1702 (2014)); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  This "'highly deferential standard" demands that state-court decisions be "given the benefit of the doubt.'"  *Cullen*, 563 U.S. at 181 (quoting *Woodford*, 537 U.S. at 24).

### 1.    Claims 1(b) and (c)

In claims 1(b) and 1(c), Petitioner alleges that his trial counsel was ineffective for promising the jury during opening statements that they would hear from co-Defendant Cedrick Jenkins, but later failing to call Jenkins to testify.  Petitioner argues that Jenkins' testimony would have exonerated him.

Petitioner and Jenkins were indicted together for Hill's first degree murder.  *Wilborn*, 962 N.E.2d at 531.  Petitioner moved to sever his jury trial from Jenkins'

17

jury trial, and that motion was granted. *Id.* In moving to sever, Petitioner argued that Jenkins had made statements implicating Petitioner, and that, at trial, Jenkins would be presenting a defense that conflicted with Petitioner's defense. *Id.* at 544.

During opening statements, Petitioner's attorney told the jury that "you'll see and hear from Jenkins."[3] *Id.* at 531. Counsel explained that the victim had "problems" with Petitioner and Jenkins. *Id.* He told the jury they would hear that the victim approached Petitioner and Jenkins on the day of the shooting, and accused Jenkins of "being out and looking for him with a gun." *Id.* The victim also told Jenkins that "I'll have this neighborhood flooded and you won't get out." *Id.* Defense counsel promised the jury that Jenkins would testify about what happened inside the gangway. *Id.* He argued that this evidence would show that: (1) Petitioner and Jenkins reasonably feared the victim; (2) the victim followed them into the gangway; and, (3) Petitioner was reasonable in his actions in the gangway to protect himself and Jenkins from the victim. [22-16], p. 326.

Despite defense counsel's opening statement, neither Jenkins nor Petitioner testified. *Wilborn*, 962 N.E.2d at 535. Following the close of the state's case, defense counsel communicated to the trial court that he had concluded, based upon an interview of Jenkins, that it was best to not call Jenkins as a witness. *Id.* The trial court confirmed on the record with Petitioner that Petitioner had spoken to his

---

[3] Defense counsel's opening statement appears in the record at [22-16], pp. 323-26.

attorney about this issue, and that Petitioner agreed that it was best to not call Jenkins.[4]  *Id.*

The defense's case consisted of calling a Chicago police officer who responded to the murder scene.  *Id.*  The officer explained that he went to the scene after being flagged down by two men.  *Id.*  At the scene, he observed other men kneeling next to the victim, and approximately 60 other people in the area near the victim.  *Id.*  He asked several people, including Richards, to stay to speak to detectives.  *Id.*  Richards nevertheless left the area before the detectives arrived.  *Id.*

Defense counsel pressed the theory that the victim was after Petitioner and Jenkins because they were in a dispute over drug territory, and argued that the victim had pursued them, not the other way around.  Defense counsel claimed that Petitioner was not guilty because "he tried to walk away."  [22-16], p. 267. Although neither Petitioner nor Jenkins testified, defense counsel was able to rely upon testimony from the State's witnesses to suggest that this was a dispute between rival gang members, and that the victim pursued Petitioner and Jenkins into the gangway.  *Id.* at 254-55.

Additionally, defense counsel pursued alternative arguments suggesting that the prosecution had presented insufficient evidence to support a guilty finding as to Petitioner.  *Id.* at 249.  Counsel elicited testimony and evidence demonstrating that Petitioner was not armed with a handgun when the police searched Woolard and Daniels' apartment, and that only one gun recovered in the search could be

---

[4] The trial court's colloquy with Petitioner appears in the record at [22-16], pp. 195-97.

conclusively linked to a shell casing recovered from the crime scene, and that gun was found in Woolard's bedroom. *Id*. Counsel relied upon the testimony of the State's witnesses to show that there was animosity between Petitioner and the victim, and that the victim followed Petitioner into the gangway. *Id*. at 251. Defense counsel also pointed out that Richards was seen standing over the victim's body and then chose to flee the scene, instead of speaking to detectives as requested. *Id*. at 260.

Petitioner submitted an affidavit from Jenkins in support of the ineffective assistance of counsel arguments he raised in his post-conviction petition. *Wilborn*, 962 N.E.2d at 536. In that affidavit, Jenkins claimed that he had been willing to testify at Petitioner's trial that the victim followed him and Petitioner into the gangway with his hands in his pockets and said, "G.K.D. yall some bitches." Jenkins claims he told the victim to "go about his business," and then turned to catch up with Petitioner. *Id*. The victim continued to pursue Petitioner and Jenkins while "talking crazy with his hand in his pocket." *Id*.

Jenkins explained that he turned around a second time, again telling the victim "to go about his business." *Id*. At that time, Jenkins believed that the victim was about to pull out a gun. *Id*. Jenkins then drew a handgun and shot the victim once. *Id*. Jenkins explained that Petitioner did not know he was armed and fled when he heard the shot. *Id*. Jenkins stated he shot the victim two more times before the gun jammed. *Id*. He then pulled out a second gun and shot the victim

four more times. *Id*. Jenkins said that he was arrested with one of the two handguns used in the shooting and disposed of the second gun. *Id*. He also claims he told the police that he alone shot the victim. *Id*.

The state appellate court on post-conviction review (the last court to consider Petitioner's claims on the merits) concluded that Petitioner could not demonstrate ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *Id*. at 542-47. The state court identified *Strickland's* familiar two-prong standard of deficient performance and prejudice. *Id*. at 542. Considering the first prong, the court concluded that Petitioner could not demonstrate that counsel's performance fell below an objective standard of reasonableness. *Id*. The state court concluded that it was proper for defense counsel to change strategy once he determined that Jenkins was adversarial to Petitioner. *Id*. at 544. Counsel discussed the issue with Petitioner and made a record of the issue in open court, where Petitioner agreed with the decision. *Id*. The court further noted that defense counsel provided a competent defense at trial. *Id*. at 544.

The Court cannot conclude that the state court ruling on these issues was either contrary to, or an unreasonable application of, *Strickland*. Both *Strickland* and the AEDPA are deferential standards, so the Court must apply a doubly deferential standard when evaluating these issues. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Because the state court considered *Strickland's* performance prong and did not need to address the question of prejudice, the Court applies

AEDPA deference to the state court's performance ruling and reviews the prejudice prong *de novo*. *Campbell v. Reardon*, 780 F.3d 752, 769 (7th Cir. 2015).

Regarding the performance prong, the Court's analysis is highly deferential because there is presumption that the challenged action might be considered sound trial strategy. *Bell v. Cone*, 535 U.S. 685, 698 (2002) (internal quotation marks and citations omitted). Here, the state court concluded that counsel's change of course during trial was a matter of sound trial strategy. An attorney may reasonably change a previously announced trial strategy when "unexpected developments" require it. *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003). When the failure to provide promised testimony cannot, however, be "chalked up to unforeseen events, the attorney's broken promise may be unreasonable, for little is more damaging than to fail to produce important evidence that had been promised in an opening." *Id.* (internal quotation marks and citations omitted).

Here, the record shows that Jenkins shifted his position regarding Petitioner at various times during these proceedings. Petitioner sought to sever his trial from Jenkins' trial because Jenkins made statements to the police implicating Petitioner and was expected to be a hostile witness if called by Petitioner to testify. Additionally, it appears that, before trial, defense counsel spoke with Jenkins and determined that Jenkins would testify that Petitioner was not involved with Hill's murder. Before counsel could present him, however, Jenkins reverted to his prior

story and was again expected to testify against Petitioner's interest. Counsel raised the issue with the trial judge, who then asked Petitioner about the issue on the record:

> THE COURT: Mr. Wilbourn, your attorney informed me that he has your co-defendant, Mr. Cedric Jenkins, present. And he is available. He has been interviewed. Based on that interview, your attorney has decided that he thinks it is to your best interest not to call this witness. He also explained to me he discussed that with you. Is that correct?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you agree with that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Also, he's informed me that you have decided that you do not wish to testify in your own behalf. Is that correct?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Anyone threatened you or force you not to testify?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Anybody promise you anything to get you not to testify?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: You have discussed this with your attorney as well?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you understand even though based on his knowledge, expertise and experience he may make a recommendation to you as to how he suggests you proceed, but the decision to testify or not to testify is your decision and not his. Do you understand that?

THE DEFENDANT: Yes, sir.

[22-16], pp. 195-196.

Trial counsel cannot be faulted for the shifting nature of Jenkins' position. Counsel properly investigated the issue and made strategic choices based on the information he gathered. *Strickland*, 466 U.S. at 690-91 (instructing that strategic choices made after thorough investigation of the law and facts are virtually unchallengeable). It was Jenkins, not the defense attorney, who turned on Petitioner. The record provides no evidence to suggest that defense counsel should have anticipated Jenkins' story change. Additionally, counsel pursued arguments that were plausible without Jenkins' testimony by asserting the same self-defense theory and arguing that the state presented insufficient evidence to convict Petitioner. The state court's ruling that defense counsel did not provide deficient performance is neither contrary to, nor an unreasonable application of, *Strickland*.

Nor can Petitioner demonstrate prejudice from counsel's change in strategy or his failure to call Jenkins as a witness. To demonstrate prejudice, Petitioner must show that there was "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (citing *Strickland*, 466 U.S. at 694). This Petitioner cannot do. Several eyewitnesses placed Petitioner in the gangway with Jenkins and the victim immediately before the shooting. Petitioner implicated himself to Daniels, and, at

the time of his arrest, he possessed the same type of ammunition that was found at the crime scene.

Failing to undermine such compelling evidence, Jenkins' contrary story in support of Petitioner's post-conviction petition suffers from a fatal lack of credibility. Even though Jenkins now claims in his affidavit that he was the sole shooter, and that Petitioner was merely an innocent bystander, the record shows that Jenkins' version of events has turned and twisted, like leaves in an autumn wind, running the gamut from one extreme (implicating Petitioner) to the other (now allegedly exonerating him). Beyond such material inconsistencies, Jenkins' most recent story appears contrived to fit the forensic testing showing that the victim was shot with bullets from two different guns. Only after such testing came to light, Jenkins claims, conveniently, that he first shot the victim with one gun, and then used a second gun when the first gun jammed. He further claims now that he got rid of one gun, but was arrested with the second gun. That Jenkins would make the effort to dispose of one murder weapon but hold on to the second used in the same offense defies common sense. Far from demonstrating prejudice, Jenkins' affidavit lacks credibility and raises as many questions as it answers.

Moreover, the undisputed facts confirm that Petitioner and Jenkins were fellow gang members in the midst of an ongoing fight with the victim's gang over drug territory. Consistent with the jury's verdict convicting the Petitioner, a fair

reading of the record indicates that the murder Petitioner committed resulted from a simple, but tragic, turf war over drug territory.

In short, Petitioner has failed to demonstrate constitutional error, and so the state court ruling is neither contrary to, nor an unreasonable application of, *Stickland*. Claims 1(b) and 1(c) are denied on the merits.

### 2. Claim Four

Petitioner argues in claim four that the prosecutor made improper comments in closing arguments by suggesting that Petitioner's statement that he might "hit a lick" demonstrated his intent to commit a robbery. A prosecutor's comments violate due process only if: (1) the comments are improper; and (2) the improper comments violated the prisoner's right to a fair trial in context of the record as a whole. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Ellison v. Acevedo*, 593 F.3d 625, 635-36 (7th Cir. 2010). On direct appeal, the state appellate court rejected this claim, explaining that the prosecutor's argument was supported by Daniels' testimony. [22-4]. True enough: Daniels testified that he took "hit a lick" to mean that Petitioner might try to commit a robbery to get money quickly. Thus, the comment was supported by the trial record. [22-17], p. 11. As a result, the challenged comment is not improper, *see United States v. Tucker*, 820 F.2d 234, 237 (7th Cir. 1987) (instructing that a prosecutor may make comments at closing argument that are supported by the evidence at trial), and there is no constitutional error. Claim four is denied on the merits.

### 3.    Claim Six

Claim six is premised upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Apprendi* holds that any fact, other than the fact of a prior conviction, that must be proved in order to increase the prisoner's sentence above what would otherwise be the statutory maximum, must be found by a jury beyond a reasonable doubt. 530 U.S. at 490. Petitioner claims that the trial court's sentence violated *Apprendi* because it included a 25-year enhancement for personally discharging the gun that caused the victim's death, even though the jury did not find beyond a reasonable doubt that petitioner personally discharged the gun that caused Hill's death.

As explained above, the trial court sentenced Petitioner to a term of imprisonment of 55 years; that term included 30 years for the first degree murder, plus the 25-year enhancement mentioned. Yet, in total, Petitioner's 55-year sentence was less than the 60-year statutory maximum sentence he faced for his murder conviction. *See* 730 ILCS 5/5-8-1(a)(1)(a) (establishing sentencing range for murder without any sentencing enhancements at not less than 20 years and not more than 60 years). As a result, there was no *Apprendi* violation. *See, e.g., United States v. Knox*, 301 F.3d 616, 620 (7th Cir. 2002) (term of imprisonment that does not exceed the statutory maximum prison sentenced does not violate *Apprendi*); *United States v. Martinez*, 301 F.3d 860, 864 (7th Cir. 2002) (*Apprendi* does not apply where sentence imposed by the court falls within the statutory range). Claim six is denied on the merits.

### 4. Claim Seven

Petitioner argues in claim seven that the trial court erred in allowing the introduction of hearsay evidence. In this case, the challenge to the introduction of hearsay raises a non-cognizable state law issue. *Estell v. McGuire*, 502 U.S. 62, 72 (1991). Accordingly, claim seven is denied.

## IV. Certificate of Appealabilty

The Court declines to issue a certificate of appealability under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts. Petitioner cannot make a substantial showing of the denial of a constitutional right, nor can he show that reasonable jurists would debate (much less disagree), with this Court's resolution of this case. *Resendez v. Knight*, 653 F.3d 445, 446-47 (7th Cir. 2011) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights, but if he wishes to do so, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion

suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon, but only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## V. Conclusion

Petitioner's habeas corpus petition [1] is denied on the merits. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. On the Court's own motion, Respondent Randy Pfister is terminated, and Michael Melvin, the current Warden of Pontiac Correctional Center, is added as Respondent. The Clerk shall alter the case caption to *Wilborn v. Melvin*. Civil case terminated.


Dated:   August 2, 2017

ENTERED:

John Robert Blakey
United States District Judge

29